IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 3 1 2017

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

VICTOR BERNARD WILLIAMS, M.D.

      Plaintiff,

v.

BAPTIST HEALTH d/b/a BAPTIST HEALTH MEDICAL CENTER;
DOUGLAS WEEKS, Indiv., and in his Official Capacity as
Sr. Vice-President and Administrator; EVERETT TUCKER, M.D., Indiv.,
and in his Official Capacity as a Member of the Credentials Committee;
TIM BURSON, M.D., Indiv., and in his Official Capacity as Chief of
Surgery and Chairperson of the Surgery Control Committee;
SCOTT MAROTTI, M.D., Indiv., and in his Official Capacity as a
Member of the Surgery Control Committee; SUSAN KEATHLEY, M.D.,
Indiv., and as Chairperson of the Credentials Committee;
CHRIS CATE, M.D., Indiv., and as Chairman of the Executive
Committee and Chief of Staff; THE SURGICAL CLINIC OF CENTRAL
ARKANSAS;  JOHN E. HEARNSBERGER II, M.D., Indiv.;
JOSEPH M. BECK, II, Indiv.,  CHARLES MABRY, M.D., Indiv.;
and  JAMES, COUNCE, M.D.; Indiv.

      Defendants.

CIVIL ACTION
FILE NO.:

4:17cv205- JM

This case assigned to District Judge _Moody_
and to Magistrate Judge _Deere_

## INTRODUCTION

COMES NOW, VICTOR BERNARD WILLIAMS, M.D., Plaintiff in the above-styled

action, by and through counsel, and files this, his Complaint, pursuant to, and within the time

allowed by the Fourteenth Amendment of the United States Constitution *42 U.S.C  §§ 1981,1982,*

*1983, 1985(2)(3)* and *1988* against the named and unnamed defendants for declaratory relief,

injunctive relief and for damages to redress deprivation of rights secured to Plaintiff under the

referenced federal statutes and the Constitution of the Unites States of America.

JURISDICTION

1.

This Court has original jurisdiction over this action pursuant to *28 U.S.C. § 1331* for the federal claims referenced above, and for all injuries suffered as a result of the revocation of his Arkansas State medical license in April 2014. Further, pursuant to *28 U.S.C. § 1367* this court has supplemental jurisdiction over Plaintiff's supplemental state law claims arising out of the same facts, acts, omissions, and/or transaction at issue regarding his federal claims, which arose when his medical staff privileges were revoked in April 2014.

2.

On February 28, 2017, Plaintiff suffered a defense verdict after a four-day bench trial on one count (failure to follow bylaws) of thirteen counts[1] brought by Plaintiff against Baptist Health Medical Center, the Arkansas State Medical Board and various defendants. To date, a written order has not yet been entered but Plaintiff expects that an appeal of the defense verdict is likely. However, as the material facts, including the revocation of his medical license took place subsequent to the filing of his state law complaint on February 25, 2014 [Pulaski Circuit Court, *Civil Action No. 60-CV-14-808*], throughout the state law litigation Plaintiff made it clear that he was not placing before the trial court any claims arising after he filed his lawsuit on February 25, 2014. "It is well settled that claim preclusion does not apply to claims that did not arise until *after* the first suit was filed." The Baker Group, L.C. v. Burlington Northern and Santa Fe Railway Co., 228 F.3d 883, 886 (8th Cir. 2000). See also Lundquist v. Rice Memorial Hospital, 238 F.3d 975, 977 (8th Cir. 2001),

---

[1] The trial court had entered summary judgment on the other twelve counts of the Complaint prior to the bench trial.

("Claim preclusion, however, does not apply to claims that did not exist when the first suit was filed.")

3.

Of particular note, even though he brought state law claims pursuant to the Arkansas Civil Rights Act, due to Plaintiff's inability to engage in any pre trial discovery regarding the peer review process and/or complete lack of peer review proceedings initiated against other, similarly situated physicians on the medical staff at Baptist Health Medical Center,[2] Plaintiff expressly argued in opposition to the various motions for summary judgment that, "claims (arising under federal and/or state law, the precise nature of which have not yet been determined) related to the April 2014 revocation of Plaintiff's medical license are not at issue in this case [Pulaski Circuit Court, *Civil Action No. 60-CV-14-808*], as they arose subsequent to the filing of the above-styled case [Pulaski Circuit Court, *Civil Action No. 60-CV-14-808*]."

## BACKGROUND INFORMATION

4.

Plaintiff Victor Bernard Williams, M.D., is a Black male physician, and naturally born American citizen, who was educated by State of Arkansas Schools, including the University of Arkansas Medical School. After graduation from the University of Arkansas for Medical Sciences, Plaintiff Victor Bernard Williams, was and has been duly licensed to practice medicine under the

---

[2]     At issue in the appeal of February 25, 2014 [Pulaski Circuit Court, *Civil Action No. 60-CV-14-808*], will be whether or not the trial court properly applied the Arkansas peer review statute to preclude discovery of any information related to whether or not peer review proceedings were held and/or should have been held with respect to acts and/or omissions committed by other physicians on the medical staff at Baptist Health Medical Center.

laws of the State of Arkansas since October 8, 1999. Plaintiff is a specialist, practicing in the area of cardiothoracic, vascular and general surgery. After graduating from the University of Arkansas for Medical Sciences, Dr. Williams completed a five (5) year residency in General surgery and a three (3) year Fellowship in Cardiothoracic surgery.

5.

Plaintiff became board certified in General Surgery in February 2003 and was last re-certified in December 2012. Plaintiff was also certified by the American Board of Thoracic Surgery in 2005, and re-certified in 2016. Each time Plaintiff has been required to take his board examinations in order to maintain his board certifications and/or to become re-certified in General Surgery and Thoracic Surgery, he has done so and he passed his boards, the most recent time in 2016.

6.

From the time that the Plaintiff was on the medical staff at Baptist Health d/b/a Baptist Health Medical Center, due to hard work and the providing of good medical care to the referring physicians' patients, he has completed thousands of general, cardiac, thoracic and vascular surgery cases at Defendant Baptist Hospital and other hospitals in the State of Arkansas.

**PARTIES**

7.

VICTOR BERNARD WILLIAMS, M.D., is a Black physician with his principal place of business at 9712 West Markham, Little Rock, County of Pulaski, Arkansas 72205.

8.

Defendant, Baptist Health d/b/a Baptist Health Medical Center is a private, not for profit hospital in Little Rock, Arkansas governed by a Board of Directors of Baptist Health d/b/a Baptist

Health Medical Center. Defendant, Baptist Health d/b/a Baptist Health Medical Center, may be served by delivering a copy of the Complaint and Summons to its registered agent, Russell D. Harrington, 9601 Interstate 630, Exit 7, Little Rock, Arkansas 72205.

9.

Defendant Douglas Weeks, at all times relevant hereto, was the Sr. Vice-President and the Administrator of Baptist Health d/b/a Baptist Health Medical Center. As such, he is sued individually, and in his official capacity as the Administrator of Baptist Health Medical Center. He is subject to the jurisdiction and venue of this Court and may be personally served at 9601 Interstate 630, Exit 7, Little Rock, Arkansas 72205.

10.

Defendant Surgical Clinic of Central Arkansas and Baptist Health Medical Center engaged in a joint venture outpatient surgery center ("The Pavilion") that is located on the first floor in the Hickingbotham Building of the Baptist Health Medical Center, Little Rock campus. As such, this Defendant was biased and stood to gain financially from the adverse actions taken against Plaintiff. Defendant Weeks was involved in setting up the joint venture, and at all times relevant hereto was a member of the board of the Surgical Clinic of Central Arkansas, and was biased along with Defendant Everett Tucker. Defendant may be served by serving its registered agent, Chris M Cate M.D., at 9500 Kanis Road, Suite 501, Little Rock, Arkansas 72205.

11.

Defendant, Everett Tucker, M.D., is a General Surgeon who, at all times material to the allegations in this Complaint, was a board member of the Surgical Clinic of Central Arkansas, and was also a general surgeon engaged in the practice of medicine in the Little Rock, Arkansas Pulaski

County area. As such, he was biased, and he stood to gain professionally from the adverse actions taken against Plaintiff. He is sued individually, and in his Official Capacity as a Member of the Credentials Committee at Baptist Health Medical Center. He is subject to the jurisdiction and venue of this Court and may be served at the Surgical Clinic of Central Arkansas, Suite 501, 9500 Kanis Rd., Little Rock, AR 72205.

12.

Defendant Tim Burson, M.D., is a physician neurosurgeon and became Chief of Surgery in January 2010. Defendant Tim Burson, M.D., was at all times material to the allegations in this Complaint engaged in the practice of medicine in the Little Rock, Arkansas Pulaski County Area. He is sued individually and in his Official Capacity as an officer and/or agent of Baptist Health Medical Center. During the time period relevant to the adverse actions taken against Plaintiff, Defendant Tim Burson, M.D. was Chief of Surgery and Chairperson of the Surgery Control Committee of Baptist Health Medical Center.[3] As such, when acting in these capacities, Defendant Tim Burson, M.D. is/was authorized to act on behalf of the medical staff at Baptist Health Medical Center. He is subject to the jurisdiction and venue of this Court and may be served at his office located on the Baptist Medical Center campus at Medical Towers I Building, Suite 310, 9601 Baptist Health Dr., Little Rock, AR 72205.

---

[3]     The Surgical Control Committee of Baptist Health Medical Center consists of physician staff members at Baptist Health Medical Center, who are elective or specified representatives of the Medical Staff, and who are authorized to act on behalf of the medical staff at Baptist Health Medical Center. The members of the Surgical Control Committee who are also named defendants in this action, and who are all white males, were also surgeons and direct economic competitors of Plaintiff. In addition to these defendant surgeons, all of the other members of the Surgery Control Committee of Baptist Health Medical Center are White males.

13.

Defendant Scott Marotti, M.D., a member of the Surgery Control Committee, is a general surgeon and a direct competitor of Plaintiff Dr. Williams. At all times relevant hereto, he was also a member of the Surgical Clinic of Central Arkansas, and was biased and stood to gain professionally from the adverse actions taken against Plaintiff. Defendant Scott Marotti, M.D. is subject to the jurisdiction and venue of this Court and may be served at the Surgical Clinic of Central Arkansas, Suite 501, 9500 Kanis Rd., Little Rock, AR 72205.

14.

Defendant, Susan Keathley, M.D., is a pediatric physician who, at all times material to the allegations in this Complaint, was engaged in the practice of medicine in the Little Rock, Arkansas Pulaski County Area. She is sued individually, and in her Official Capacity as Chairperson of the Credentials Committee at Baptist Health Medical Center. She is subject to the jurisdiction and venue of this Court and may be served at 2218 Walnut Grove Rd., Little Rock, AR 72223.

15.

Defendant, Chris Cate, M.D., Chairman of the Executive Committee and Chief of Staff at Baptist Health Medical Center, at all times material to the allegations in this Complaint, was engaged in the practice of medicine in the Little Rock, Arkansas Pulaski County area. Defendant Chris Cate, M.D., as Chairman of the Executive Committee, influenced other members of the Executive Committee due to his bias, and the fact that he stood to gain financially from the adverse actions taken against Plaintiff as a member of the Surgical Clinic of Central Arkansas. As such, he was directly involved with Defendants Burson, Tucker and the other named Defendants in discriminatory acts and conduct that harmed the Plaintiff. He is sued individually, and in his Official Capacity as

-7-

Chairman of the Executive Committee and Chief of Staff at Baptist Health Medical Center. He is subject to the jurisdiction and venue of this Court and may be personally served at theSurgical Clinic of Central Arkansas, Suite 501, 9500 Kanis Rd., Little Rock, AR 72205.

16.

Defendant John E. Hearnsberger II, M.D., who, with respect to the allegations raised herein, acted maliciously, outside the scope of his lawful authority, as a member of Defendant Arkansas State Medical Board, and is being sued individually and in personal capacity, while acting under color of authority of state law while committing the tortious conduct alleged herein. Defendant John E. Hearnsberger II, M. D, is subject to the jurisdiction and venue of this Court and may be served by delivering a copy of the Summons and Complaint to John E. Hearnsberger, II, M.D., at 132 Medical Circle, Site 200, Nashville, Arkansas 71852.

17.

At all times material to the allegations of this Complaint, Defendant Joseph M. Beck, II, M.D., acted maliciously, and served as the Chairman and/or President of the Arkansas State Medical Board while acting under color of authority of state law, even though the unlawful, tortious conduct he engaged in was outside the scope of his lawful authority. As such, he is sued individually, in his personal capacity. He is subject to the jurisdiction and venue of this Court, and may be served at 500 S. University Ave., Little Rock, AR 72205.

18.

Defendant Charles Mabry, M.D., at all times relevant to the allegations of this Complaint, was a general surgeon who agreed with the defendants to provide a medical opinion that would be used to revoke Plaintiff's medical staff privileges in the event that Plaintiff failed to voluntarily abandon

-8-

his claims of racial discrimination against Baptist Health Medical Center. He is subject to the jurisdiction and venue of the Court, and may be served at 1801 W. 40th Ave., Suite 7B, Pine Bluff, AR 71603.

19.

Defendant James, Counce, M.D., at all times relevant to the allegations of this Complaint, was a general surgeon who agreed with the defendants to provide a medical opinion that would be used to revoke Plaintiff's medical staff privileges in the event that Plaintiff failed to voluntarily abandon his claims of racial discrimination against Baptist Health Medical Center. He is subject to the jurisdiction and venue of the Court, and may be served at 3276 Northhills Blvd., Fayetteville, AR 72703.

**FACTS RELEVANT TO ALL COUNTS**

20.

On November 25, 2003, Plaintiff was first granted medical staff privileges at Baptist Health Medical Center, Little Rock for the two year time period November 2003 through November 2005. At the time that he obtained medical staff privileges at Baptist Health Medical Center, Plaintiff was the only African-American surgeon in Little Rock, Arkansas, who provided both the range and the type of surgeries to patients in and around Pulaski County, Arkansas, in the areas of general, cardiac, thoracic and vascular surgery.

21.

On September 26, 2005, Plaintiff submitted his first application for reappointment of his medical staff privileges at Baptist Health Medical Center, Little Rock. On February 27, 2006, Plaintiff was notified that his application for reappointment had been granted, and that his clinical

-9-

privileges had been approved for an additional (second) two year period.

22.

On November 8, 2007, Plaintiff submitted his second application for reappointment of his medical staff privileges at Baptist Health Medical Center, Little Rock. On March, 20, 2008, Plaintiff was notified that his application for reappointment had been granted, and that his clinical privileges had been approved for an additional (third) two year period.

23.

In November 2008, Plaintiff purchased a parcel of real property located at 9712 W. Markham St., Little Rock, Arkansas for the purpose of constructing a medical office to provide treatment for his surgical patients, to include those patients that he treated at Baptist Health Medical Center, Little Rock.

24.

On November 3, 2009, Plaintiff submitted his third application for reappointment of his medical staff privileges at Baptist Health Medical Center, Little Rock.

25.

In the fall of 2009, Plaintiff completed the build out process for his medical office located at 9712 W. Markham St., Little Rock, Arkansas, and began advertising the same to inform patients, both current and potential, that he would begin servicing and treating patients there.

26.

At the time that Plaintiff applied to renew his medical staff privileges at Baptist Health Medical Center, Little Rock, in the fall of 2009, he had no reports of medical malpractice payments, no reports of state licensure actions, no reports of exclusions or debarment actions, no reports of

–10–

clinical privileges actions, no reports of professional society actions, and no reports of DEA/Federal licensure actions. As they had done with respect to each previous time that they had processed Plaintiff's application and/or re-application for privileges, employees, agents and/or representatives of Baptist Health Medical Center obtained and verified this information by submitting a query to the National Practitioner Data Bank on December 15, 2009. Even though Plaintiff is/was Board Certified in cardiothoracic and general surgery, as his surgical practice continued to grow in 2009, he performed more and more general surgery procedures leading to professional hostility from his white surgical competitors on the medical staff at Baptist Medical Center, particularly those who belonged to the surgical group,

27.

At some point prior to the fall of 2009, Baptist Health entered into a joint venture with the Surgical Clinic of Central Arkansas to operate a for profit outpatient surgery center (The Pavilion) located on the Baptist Health Medical Center, Little Rock campus, whereby the two entities shared profits on an equal basis. For surgical procedures performed at The Pavillion by the Surgical Clinic of Central Arkansas, with respect to revenue that is earned, there is both a facility fee, and a surgery fee. The facility fee is split between the members of the joint venture, Surgical Clinic of Central Arkansas, and Multi Management Services, a for profit subsidiary of Baptist Health, with each receiving fifty percent.

28.

The defendants, to include Weeks and Tucker, felt that Plaintiff was planning to start up a clinic on his commercial property located at 9712 W. Markham Street, Little Rock Arkansas during the time period when Plaintiff completed the build out process in the fall of 2009. Based upon their

racial animus toward Plaintiff, the defendants, to include Weeks and Tucker, felt that Plaintiff's general surgery practice was growing too rapidly, and that as a Black general, vascular, and cardiothoracic surgeon, Plaintiff and his surgical practice would take away from the revenues generated by the Surgical Clinic of Central Arkansas. This is particularly true given the significant number of Black patients who had been treated by Plaintiff prior to the opening of his medical office on West Markham Street, in Little Rock, Arkansas in the fall of 2009.

29.

According to reports generated during Plaintiff's 2009 credentialing re-application process, it was documented that during the one year period September 1, 2008, through August 31, 2009, Plaintiff had performed over 550 surgical procedures at Baptist Health Medical Center, Little Rock. As Chief of the Department of Surgery, Defendant Burson became aware of the number of surgical procedures performed by Plaintiff when he approved Plaintiff's re-credentialing application packet in January 2010. This information, along with the other information gathered during Plaintiff's re-credentialing process, was communicated to the other defendants, including Weeks and Tucker.

30.

On February 5, 2010, Defendants Weeks and Burson met with Plaintiff and attempted to coerce him into voluntarily resigning his medical staff privileges because they knew that there was no sufficient basis to deny his application for re-credentialing,[4] even though on February 5, 2010 there had apparently been a decision made that Plaintiff's medical staff privileges were going to be

---

[4]      Plaintiff had obtained a letter from Defendant Marotti, acting in his capacity as Chairman of the Department of Surgery, dated November 27, 2009, after having attended a meeting with the Marotti and the Surgery Control Committee on November 16, 2009 regarding patient care. Defendant Marotti's letter provided that, "it was the decision of the committee that no action is necessary based on the information that you supplied."

terminated. The decision to terminate Plaintiff's medical staff privileges was based on his race, Black, and the race (Black) of a significant number of Plaintiff's surgical patients. During this meeting, Weeks told Plaintiff that if he didn't resign, he would receive, "the harshest penalty possible." Burson stated to Plaintiff that he should, "go ahead and resign," and that he would be, "back on staff" within days.

31.

After thinking about it for a couple of days, Plaintiff wrote Weeks on February 8, 2010 and informed him that he was not going to voluntarily resign, especially since Weeks and Burson had failed to give him a factual basis that would support the termination of his medical staff privileges. When Plaintiff notified Weeks of his decision not to voluntarily resign, the hospital defendants, to include Weeks, Burson, Marotti, Keathley, Tucker and Cate entered into an agreement that they would cause Plaintiff's Baptist Health Medical Center medical staff privileges to be revoked and terminated, and that they would then report to the Arkansas State Medical Board and the National Practitioner Data Bank that Plaintiff had committed acts which constitute, "poor preoperative judgment, poor medical decision-making, poor technical ability, an inability to recognize post-operative complications, lack of timely follow-up, and lack of responsiveness to patients."

32.

Because on February 5, 2010, he had no factual basis to support their attempt to force Plaintiff to voluntarily resign his medical staff privileges, Defendant Weeks used the employees, agents, and representatives of Baptist Health to perform a look back and/or search through all of Plaintiff's patient's charts immediately after the receiving Plaintiff's February 8, 2010, letter. The search through Plaintiff's patients' medical records was done in an effort to cover up the true motive, racial

discrimination, as the decision had already been made to terminate Plaintiff's medical staff privileges, not because of his competency or performance, but because of his race, Black, and in an effort to curtail Plaintiff's Black patient base in the Little Rock, Arkansas area. The employees, agents, and/or representatives of Baptist Health Medical Center had to search back through Plaintiff's patient charts as far back as over one year (February 2009),[5] in order to locate facts which they thought could be used in order to raise purported "concerns" about Plaintiff's medical judgment, technical ability, and responsiveness to patients, notwithstanding that these cases should have already been reviewed under the hospital's normal credentialing and quality assurance policies and procedures. See Tactics Characteristic of Sham Peer Review, *Journal of American Physicians and Surgeons*, Volume 14, Number 3, Fall 2009, wherein it is provided in relevant part, "[a]lthough the numerator-without-denominator tactic can be used against any physician, it is most commonly used against surgeons. Hospitals that use this tactic typically select cases that are specifically designed to highlight complications or negative outcomes. The selection of cases often falls outside the routine protocol used for selecting cases for review of physicians practicing at the hospital. The hospital then presents this select group of cases to peer reviewers as evidence that the targeted physician is a bad doctor or provides unsafe care. Hospitals that use this tactic specifically omit the denominator (how many cases of that type the physician has performed over a period of time), thus eliminating the possibility of calculating a complication rate that could be used to make a fair comparison with statistics of other colleagues, or statistics published in medical literature. Virtually all surgeons, of course, experience complications, and the only surgeons who have zero

---

[5]       The patient that was treated by Plaintiff in February and March 2009 was the one that the defendants chose to have reviewed by Defendant Mabry at the request of the Arkansas State Medical Board.

complications are those who do not perform surgery, or who do not report their complications."

33.

The fact that the hospital defendants went outside of the routine protocol utilized by the hospital to review other physicians on the medical staff is easily established in this case because unbeknownst to Defendant Weeks, Plaintiff's application for re-credentialing was already pending when the conspiracy to terminate his medical staff privileges on the basis of his race commenced. Just days before the February 5, 2010 meeting wherein Plaintiff was asked by Weeks and Burson to voluntarily resign his medical staff privileges, Defendant Burson, acting in his capacity as Chief of the Department of Surgery, had just signed Plaintiff's application for re-credentialing (on January 18, 2010), where he recommended that Plaintiff's application for reappointment to the medical staff be approved, and where he further expressly attested that:

*I have reviewed this Application for Reappointment and supporting documentation. I have knowledge of this Applicant's clinical judgment and technical skills and I believe this Applicant is competent to perform the clinical privileges requested, including clinical privileges for performing high-risk procedures and treating high-risk conditons.*

34.

Yet, on March 23, 2010, Defendant Burson wrote Plaintiff and informed him that on March 15, 2010, the Surgical Control Committee had met, discussed and reviewed eleven cases (from five different patients),[6] where Plaintiff was the operating surgeon without first inviting Plaintiff to attend

---

[6]    With respect to one of the patients, after Plaintiff explained that he had already met with the Surgical Control Committee to discuss this case in November, 2009, allegations surrounding the patient were dropped.  With respect to the medical treatment provided to three of

the meeting. This meeting, if it occurred,[7] was in violation of the Baptist Health Medical Center's

Bylaws of the Professional Staff, Section 13.8.2.1, which provides that, "A Practitioner whose

patient's clinical course is scheduled for discussion at a committee, clinical department or ancillary

service meeting shall be so notified and shall be expected to attend such meeting. Whenever apparent

or suspected deviation from standard clinical practice is involved, the notice to the Practitioner shall

so state, shall be given by certified mail, return receipt requested, and shall include a statement that

his attendance at the meeting at which the alleged deviation is to be discussed is mandatory."

35.

Burson's March 23, 2010, letter requested that Plaintiff appear on April 5, 2010 at 5:00 p.m.

in the Baptist Health Medical Center's Administrative conference room to discuss the cases. Since

Burson and Weeks already knew that Plaintiff's medical staff privileges would be terminated, they

scheduled the meeting or "interview" in order to seemingly comply with the requirements of the

medical staff bylaws, but they agreed to only give Plaintiff the identities of the patients, and to not

inform him of the nature of the suspected deviation from the appropriate standard of care. This was

intentionally done for several reasons. One, so that it would be more difficult for Plaintiff to defend

---

the four remaining patients at issue, the medical treatment provided had occurred several months
prior to Burson's approval of Plaintiff's application for re-credentialing on January 18, 2010.
Moreover, none of the medical treatment provided to the patients at issue arose from the same
surgical procedures and/or complications of surgery as one of the other patients. In addition, the
Board of Trustees approved Plaintiff's application for re-credentialing on February 25, 2010,
after the Credentials Committee had recommended the same on January 20, 2010.

[7]      Inconsistent with the expressed language contained in the medical staff bylaws
that requires that permanent minutes signed by the presiding officer be kept and maintained
reflecting the vote taken on each matter, there has never been any minutes of this meeting
produced during discovery in Pulaski Superior Court *Civil Action No. 60CV-14-808* or otherwise,
despite several requests by Plaintiff and a motion to compel seeking the same.

against the charges being made against him. Two, so that they could later maintain that termination of Plaintiff's medical staff privileges was warranted in lieu of less severe forms of corrective action given to other, similarly situated white physicians on the medical staff who had committed far worse acts and/or omissions than those alleged to have been committed by Plaintiff because without prior knowledge of the alleged deviations from the applicable standard of care, it would be more likely that Plaintiff would state at the April 5, 2010, "informal" interview that he would, "stick by what he did."

36.

On March 29, 2010, because he had already been told by Weeks on February 5, 2010 that if he didn't voluntarily resign he would receive the "harshest penalty possible," and because he was unaware of the general nature of the factual allegations against him, Plaintiff wrote Burson in response to his March 23, 2010, letter in relevant part as follows: "Would you please advise me in each of the five identified cases of each apparent or suspected deviation from the standard of care? Would you also identify in each case whether the apparent or suspected deviations is one of surgical judgment, both preoperative and postoperative, technical abilities, or lack of responsiveness in emergency situations. This information should help me to fully address the concerns of the committee."

37.

On March 31, 2010, Burson responded to Plaintiff's March 29, 2010 letter and in relevant part stated that, "The Surgical Control Committee spent a good deal of time considering whether to list specific questions on each patient in our letter of March 23, 2010," and that, "the Committee felt that the general areas listed as concerns applied to greater or lesser degree in each case." In concluding

his letter where, Burson stated that, "the Committee respectfully declines to list specific questions for each case."

38.

On April 1, 2010, Plaintiff wrote Burson in response and asked that he "at least [be] provided a copy of committee meeting minutes so that I may fully answer all questions," and that, "[i]f your decision is unchanged, then I request a rescheduling of the hearing from April 5th for 10 days to allow me adequate time to fully review each chart in preparation of the hearing."  Because he felt that he was being discriminated against, Plaintiff also requested permission to have a court reporter present during the scheduled interview.

39.

Meanwhile, on April 1, 2010, Rebecca Cunningham wrote Plaintiff a letter informing him that his reappointment application to the Baptist Health Professional Staff had been approved for an additional (fourth) two year period effective March 2010 through March 2012.

40.

On April 5, 2010, when responding to Plaintiff's request to have a court report attend the rescheduled (April 12, 2010) meeting at Plaintiff's expense, Burson responded that, "we have never allowed recordings of these meetings or the presence of a court reporter.  In addition, the Control Committee cannot take any formal action regarding a physician's privileges."

41.

When he participated in the interview before the Surgery Control Committee on April 12, 2010, Plaintiff had not been given any information before hand on the nature of the alleged deviations from the appropriate standard of care and he did not have the opportunity to refute any

–18–

specific allegations that were later made against him as he was not allowed to bring counsel, and there were no witnesses present who testified against him. During the April 12, 2010, interview, the members of the Surgery Control Committee did not express any specific concerns and/or attempt to inform Plaintiff of the alleged deviations from any applicable standard of care. Further, at not time during the April 12, 2010, interview, did anyone on the Surgery Control Committee articulate to Plaintiff the alleged deviations from standards of care at issue, even though at the conclusion of the interview they recommended to the Credentials Committee that corrective action be taken against Plaintiff.[8] Unbeknownst to Plaintiff at the time, because the decision to terminate his medical staff privileges had already been made, the ulterior motive for having Plaintiff attend the interview with the Surgery Control Committee was for the hospital defendants to question Plaintiff in an effort to obtain information required for the preparation of a script of rhetorical questions that could be posed to Plaintiff at a subsequent hearing (April 21, 2010) before the Credentials Committee.

42.

On April 21, 2010, Defendant Keathley, acting in her capacity as Chairperson of the Credentials Committee, along with Defendant Tucker, who was the only general surgeon on the Credentials Committee, used the script that was prepared after Plaintiff's interview with the Surgery Control Committee to cause the Credentials Committee to agree with the Surgery Control Committee's recommendation for corrective action, and made a recommendation to terminate Plaintiff's medical staff privileges, rendering him unable to continue to provide medical services at Baptist Hospital from that date forward. Tucker didn't review the medical charts at issue before the

---

[8]     Defendant Weeks participated in the interview with the Surgery Control Committee, and immediately notified Plaintiff following the meeting that corrective action was being recommended.

proceedings before the Credentials Committee and he merely propounded the questions to Plaintiff that were contained in the typewritten notes that had been given to him and Defendant Keathley to use during the proceedings. As a member of the Surgical Clinic of Central Arkansas, Tucker, who was the only general surgeon on the Credentials Committee, was personally biased against Plaintiff and stood to gain financially by recommending to the other members of the Credentials Committee that Plaintiff's medical staff privileges be revoked.

43.

Plaintiff was discriminated against on the basis of his race, Black, during the entire course of the disciplinary proceedings commenced against him which led to the termination of his medical staff privileges at Baptist Health Medical Center, Little Rock. The hospital defendants actions were knowingly discriminatory, arbitrary and capricious, as the hospital defendants maliciously, and intentionally treated Plaintiff differently than similarly situated physicians who had committed acts and/or omissions far worse than those alleged to have been committed by Plaintiff, as no other surgeon or physician had been disciplined in the manner in which Plaintiff was even though it was common knowledge that several white, similarly situated physicians, to include other surgeons on the medical staff, had engaged in conduct far worse than the allegations against Plaintiff even though no disciplinary actions at all had been taken against them.

44.

After his medical staff privileges were revoked in April 2010, Plaintiff immediately pursued the appeal process authorized pursuant to the Baptist Health Medical Center's medical staff bylaws. Attorney Gene McKissic notified defendant Weeks via letter dated May 14, 2010, that he would be representing Plaintiff during the appellate process at Baptist Health Medical Center.

-20-

45.

At the time that Plaintiff's medical staff privileges were terminated by Baptist Hospital in April 2010, there had not been a complaint[9] filed with the Arkansas State Medical Board against Plaintiff by any patient and/or person related to the four cases that were at issue at the hospital.

46.

McKissic formally filed a notice of appeal of the Credentials Committee's recommendation on May 25, 2010, and included in the notice of appeal to Baptist Health, a statement that Plaintiff believed that the actions taken against him were "racially biased and discriminatory," and that white physicians at Baptist Health Medical Center who had been subject to corrective action had not "received such severe punishment."

47.

At some time on or before October 19, 2010, employees, agents and/or representatives of the Arkansas State Medical Board had obtained copies of the medical records of the four patients at issue during the appellate process at Baptist Hospital related to the termination and/or revocation of Plaintiff's medical staff privileges. When the Medical Board first obtained the medical records of the patients that were used by Baptist hospital to terminate Plaintiff's medical staff privileges, Plaintiff had not yet exhausted the appeal rights that he had available at Baptist Hospital pursuant to the medical staff bylaws.

48.

The Medical Board's policy and customary practice had always been to await the outcome of

---

[9]    The customary practice at the Arkansas State Medical Board is to promptly give the physician notice and the opportunity to respond to any such complaints immediately after they are received.

any appeals and/or litigation related to medical treatment provided by a physician prior to any formal action being taken by the Board. However, because of their prior and current relationships with Defendant Baptist Health Medical Center, Defendants Hearnsberger and Beck knew and agreed with the other defendants that they would utilize their positions with the Arkansas State Medical Board to cause injury to Plaintiff, to include revoking his medical license, if necessary, in order to help Baptist Health Medical Center defend against Plaintiff's claims of racial discrimination.

49.

On or about November 12, 2010, without first having received a patient complaint (as customarily required under the Board's policies) from any person, agents, employees and/or representatives acting pursuant to authority conferred by the Arkansas State Medical Board,[10] obtained and sent the medical records of Plaintiffs' patients that had been purportedly used by Baptist Hospital to terminate the Plaintiffs' medical staff privileges to two outside reviewers. As Chairman, Defendant Beck condoned and/or ratified the Board's initiation of an unauthorized investigation against Plaintiff even though he knew that it was the Board's policy to wait until the final decision from the hospital and/or the conclusion of any related judicial proceedings before seeking to discipline a physician regarding matters that have been subject to hospital disciplinary proceedings.[11] Defendant Hearnsberger, the only general surgeon on the Arkansas State Medical

---

[10]    Upon information and belief, the hospital medical records of Plaintiff's patients were sent to Counce and Mabry by Ms. Peggy Cryer, Executive Secretary of the Arkansas State Medical Board.

[11]    Of course the hospital and/or the Arkansas State Medical Board could have sought a summary suspension of Plaintiff's Arkansas Medical License in order to prevent imminent danger to the health or safety of any individual, but neither sought to do so at any time because they would have been required to promptly justify their actions, and they knew that they could not do so.

Board at the time, and a former member of the Surgery Control Committee at Baptist Medical Center,[12] acted outside the scope of his authority as a medical board member and participated directly in the Board's investigation of Plaintiff, and gathered and provided false, misleading information to the other Board members who were not general surgeons in order to unduly influence their opinion against Plaintiff, and to influence them to vote to take adverse actions against Plaintiff.

50.

One of the reviewers selected, James S. Counce, M.D., was also the partner in a medical practice with one of the State Medical Board members, John B. Weiss, M.D. Counce was asked to provide an expert opinion in general surgery even though neither Counce nor Weiss practiced general surgery. The defendants all knew and agreed, that Counce would give them an opinion that, along with the opinion to be given by Mabry, would be used, if necessary, to revoke Plaintiff's Arkansas Medical License if he continued to pursue and/or did not voluntarily abandon his claims of racial discrimination against Baptist Health Medical Center, its agents, employees, and/or representatives.

51.

The other reviewer who was selected to review the medical records of one of Plaintiff's patients who had been treated by Plaintiff in February and March of 2009, was Dr. Charles Mabry. Mabry had been trained by Defendant Hearnsberger when Mabry was a junior resident during the time when Hearnsberger was a chief resident at the University of Arkansas medical school. In addition, at the time that he was preparing his expert report regarding medical treatment provided by Plaintiff in November 2010, Mabry was a named defendant in at least two civil actions accusing

---

[12]      When responding to written discovery in the Pulaski Circuit Court case, Baptist Health Medical Center denied that Hearnsberger had ever served on the Surgery Control Committee but he testified otherwise during his deposition testimony.

him of racial discrimination under 42 U.S.C. § 1981 and/or the Arkansas Civil Rights Act. See Davis v. Jefferson Hospital Association, 685 F.3d 675, 682 (8th Cir. 2012),[13] and Harper v. Jefferson Hospital Association, 2011 U.S. Dist. LEXIS 58899, (E.D. Ark. 2011). The defendants all knew and agreed, that Mabry would give them an opinion that, along with the opinion to be given by Counce, would be used, if necessary, to revoke Plaintiff's Arkansas Medical License if he continued to pursue and/or did not voluntarily abandon his claims of racial discrimination against Baptist Health Medical Center, its agents, employees, and/or representatives.

52.

When Peggy Cryer, in her capacity as employee of the Arkansas State Medical Board, acting outside the scope of her lawful authority, at the direction of Defendant Beck, as Chairman of the Board, submitted the medical records to Counce and Mabry in November 2010, nearly five months before the hospital's appellate process had run its course, Cryer also sent a transmittal letter to them explaining the negligence standard to be utilized when giving their expert opinion of the records reviewed. The transmittal correspondence sent by Cryer to Mabry and Counce also included a memorandum notifying them of the definitions of the standard ("gross negligence" and "ignorant malpractice") that was to be included in their report because all of the defendants knew that during the hospital disciplinary proceedings, there had been no allegations made that Plaintiff had committed "gross negligence" and/or "ignorant malpractice," which would be a finding necessary before the Board would be lawfully authorized to take any disciplinary action against Plaintiff under

_____

[13]    During the appellate process involving Plaintiff's appearances at Baptist Medical Center in the May, 2010 - April, 2011 time-frame, and in all of Plaintiff's appearances at the Arkansas State Medical Board during the December 2010 - January, 2014 timeframe, Mr. Gene McKissic was Plaintiff's counsel. McKissic was also counsel for the Plaintiff in Davis v. Jefferson Hospital Association, 685 F.3d 675 (8th Cir. 2012).

-24-

the Arkansas Medical Practices Act.  The November 12, 2010, transmittal letter sent to Dr. Counce along with medical records requested that the reviews be provided to the Board before November 19, 2010, in time for the December 2010 Medical Board meeting, and informed him that, "we very much appreciate your willingness to work with us to settle this case promptly."

53.

As a result of Plaintiff's meeting with the Medical Board in December 2010 the Medical Board required that he get a proctor[14] for all colon surgery cases that he would perform in the future even though there had never been a hearing noticed against Plaintiff or any findings made against Plaintiff for a violation of the Arkansas Medical Practices Act.

54.

Immediately after Plaintiff exhausted the appellate process at Baptist Health Medical Center, and after he was notified that a final decision made by the Baptist Health Board of Trustees upholding the termination and revocation of his privileges had been made on April, 12, 2011, Plaintiff filed a civil action (*No. 60CV-11-1990*) in Pulaski County Circuit Court against Baptist Health Medical Center, and others on April 21, 2011, wherein he alleged, among other things, that he had been discriminated against because of his race, Black, in violation of the Arkansas Civil Rights Act of 1993.  In addition, Plaintiff also alleged other state law claims including, conspiracy, defamation, tortious interference with contracts, and violations of rights secured by the Arkansas Constitution.

---

[14]    Accordingly, Plaintiff promptly obtained a board certified proctor (Dr. Carl Gilbert) as directed by the Medical Board.

55.

At the time that he served his Complaint on April 21, 2011, (*Civil Action No. 60CV-11-1990*) Plaintiff also served extensive, detailed discovery requests wherein he sought discovery information regarding other similarly situated physicians on the medical staff at Baptist Health Medical Center so that during the litigation of the case, he could easily establish that he had been treated differently with respect to the disciplinary actions taken against him, and/or so that he could establish that the medical staff bylaws were applied to him in a discriminatory manner with respect to the termination of his medical staff privileges.

56.

On June 16, 2011, Peggy Cryer wrote Plaintiff a letter which provided in relevant part as follows:

> *The Board received notification May 2, 2011 from Baptist affirming their Hearing Committee's recommendation to terminate your staff appointment and clinical privileges.*
>
> *This letter will confirm the Board's decision and your agreement with the Board at the June 9-10, 2011 meeting appearance regarding this issue wherein you agreed to:*
>
> > \*   *Continue current agreement with the Board regarding colon surgeries wherein you will refrain from performing colon procedures unless assisted by another surgeon pending resolution of your court case;*
> > \*   *Return in one (1) year for an update (June 2012);*
> > \*   *Have a proctor provide quarterly reports to the Board on your procedures.*

57.

On June 17, 2011, a representative of the Arkansas State Medical Board, acting at the direction of Defendant Beck, Chairman, sent the reports generated by Counce and Mabry to Baptist

Health Medical Center for its use in *Civil Action No. 60CV-11-1990*. In the transmittal letter, the Board's representative stated that, "Dr. Counts [Counce] and Dr. Mabry do not have to testify or follow-up for further testimony or work concerning these reviews unless they desire to."

58.

When the Baptist Health Defendants finally responded to Plaintiff's discovery requests in (*Civil Action No. 60CV-11-1990*) on July 14, 2011 after they had been granted an extension of time by Plaintiff, they objected to most of Plaintiff's discovery requests, and failed to respond to interrogatories or produce any information regarding similarly situated physicians on the medical staff. Plaintiff, through counsel, in (*Civil Action No. 60CV-11-1990*) wrote a good faith letter in an attempt to obtain discovery on August 31, 2011, and on September 14, 2011, the Baptist Health Defendants responded indicating that they would "stand by the objections," which were mostly based upon the Arkansas Peer Review Privileges, Arkansas Code §§ 16-46-106 and 20-9-503. Their response also indicated that, "There is no exception under Arkansas law for any type of discrimination [or civil rights] claim in the statutes or case law. The court will have to decide this issue [if Plaintiff wishes to file a motion to compel]."

59.

On October 3, 2011, Dr. Gilbert submitted a report to the Medical Board which stated in relevant part as follows:

> *I have served as a proctor for Dr. Victor Williams since December 2010. I have proctored him during performance of abdominal colon operations as well as other surgical procedures at his request. I have discussed the cases with him prior to surgical interventions and in the postoperative periods. His knowledge base is proficient in the areas of general surgery, and I have found his technical abilities to be proficient as well. I have no concerns regarding his judgment or surgical technique. He has handled patients with multiple complex medical issues well.*

*In summary, his preoperative and postoperative judgment is appropriate and his technical skills are proficient and within the standard of care. For any questions please do not hesitate to contact me.*

60.

On November 16, 2011, Plaintiff filed a Motion to Compel in *Civil Action No. 60CV-11-1990*.

61.

On November 22, 2011, the Hospital Defendants filed a motion for partial summary judgment in *Civil Action No. 60CV-11-1990* regarding Plaintiff's Arkansas Constitutional claims, asserting the absence of "state action." On November 30, 2011, the Baptist Health Defendants filed a response to Plaintiff's Motion to Compel in *Civil Action No. 60CV-11-1990*.

62.

On the next day, December 1, 2011, the Arkansas State Medical Board voted to Notice Plaintiff for a disciplinary hearing, even though they had told him previously on June 16, 2011 to "Return in one (1) year for an update (June 2012)," and even though there were no other acts and/or omissions committed by Plaintiff subsequent to June 2011 that would constitute an alleged violation of the Arkansas Medical Practices Act, i.e., "gross negligence or ignorant malpractice."

63.

After being continued, the hearing was re-scheduled for June 8, 2012, and Plaintiff appeared at the Arkansas State Medical Board on that date, along with counsel, and several witnesses who were going to testify on his behalf. Prior to June 8, 2012, Counce had informed the Board that he could not attend the scheduled hearing on June 8, 2012, but Counce's inability to attend was intentionally withheld from Plaintiff. After Plaintiff arrived for the hearing, along with counsel and several witnesses who were to testify on his behalf, the Board voted to again postpone the hearing

and requested that Plaintiff cease to perform any surgical procedures at all until he completed a physician assessment program (PACE) and submit the results to the Board upon completion of the program.

64.

One of the witnesses who appeared with Plaintiff was Dr. Rhonda Tillman, who was a professor of surgery at the University of Arkansas. Tillman had given written expert opinions wherein she opined that Plaintiff had not deviated from the applicable standard of care during the disciplinary proceedings against Plaintiff at Baptist Health Medical Center. In addition to postponing the scheduled hearing because Counce was not in attendance, the Board also refused to go forward with the hearing because the defendants already knew Tillman's opinion, and because she was present to testify, they knew that she would be able to support her written opinion with further testimony during the hearing, as both a surgeon, and as a professor whose job is to teach future surgeons. In order to attack the weight of her previous written opinions, Defendant Hearnsberger called several of Dr. Williams' former professors, even though making such calls would not be encompassed by his role as a member of the Board who would sit in judgment of Plaintiff with respect to the four cases which were prematurely pending before the Board. Further, contrary to established Board policy with respect to other persons who would be authorized to conduct such investigations, if necessary, Hearnsberger failed to make a record of his communications with these former professors, even though he sent a false, defamatory email memorializing negative comments purportedly made by one of the professors in order to create bias

to influence the Board members who were not surgeons.[15]  During the entire time period that Hearnsberger had been a member of the Arkansas State Medical Board, he had never called former professors in order to investigate other allegedly incompetent physicians who had appeared before the Board after losing their medical staff privileges at a hospital.

65.

Counsel for Plaintiff made calls to the PACE physician assessment program in San Diego, California that was recommended by the Arkansas Medical Board at the June 8, 2012 meeting.  As a result of his making this inquiry, and receiving correspondence regarding the San Diego PACE program, Plaintiff and his counsel became aware that the Board had attempted to create bias against Plaintiff with the PACE program with the objective of preventing Plaintiff from having a fair and objective assessment.

66.

On June 18, 2012, the trial court in *Civil Action No. 60CV-11-1990* held a hearing on both *Plaintiff's Motion to Compel*, and *Defendants' Motion for Partial Summary Judgment*.  During the time period that both of these motions were pending for resolution by the trial court, a representative of the Baptist Health Defendants attempted to coerce Plaintiff into voluntarily dismissing his cause of action (*Civil Action No. 60CV-11-1990*), and stated to counsel for Plaintiff (in the presence of Plaintiff) that if he didn't dismiss his lawsuit, Plaintiff would have to either "admit that he had done something wrong to the Arkansas State Medical Board, or lose his medical license."

---

[15]    One of Plaintiff's former professors, Dr. Eidt, according to Hearnsberger, referred to Plaintiff as "hard-headed and poor resident."  This statement is/was false, as Plaintiff's student file at the University of Arkansas contains a favorable written evaluation from Dr. Eidt covering the entire time period that Plaintiff was a resident working under Eidt at the University of Arkansas.

67.

On June 29, 2012, the trial court in *Civil Action No. 60CV-11-1990* entered an Order on

*Plaintiff's Motion to Compel*, wherein he granted the motion with respect to 7 discovery requests,

denied the motion with respect to 37 discovery requests, and ordered that certain "documents and

information were to be produced to the court in-camera to determine the privilege," with respect to

the remaining 9 discovery requests that were subject to Plaintiff's motion to compel.

68.

On July 9, 2012, the trial court in Civil Action No. 60CV-11-1990 entered its *Order Granting

Defendants' Motion for Partial Summary Judgment*.

69.

On August 2, 2012, the trial court  in *Civil Action No. 60CV-11-1990* denied Plaintiff's

motion for reconsideration of discovery requests that had sought, among other things, what Plaintiff

thought to be discoverable information relevant to showing racial disparities that would be

necessarily contained solely in certain peer review records exclusively in the possession of Baptist

Health Medical Center.

70.

In December 2012 Plaintiff was recertified by the American Board of Surgery with his

recertification set to expire in July 2023.

71.

In February 2013, Plaintiff notified the Arkansas State Medical Board about his recertification

and requested that the same be considered in lieu of him having to complete a physician assessment

program.

72.

On March 5, 2013, upon consideration of *Plaintiff's Motion to Voluntary Non-Suit* his cause of action as a matter of right, the trial court in *Civil Action No. 60CV-11-1990* entered an *Order of Voluntary Dismissal*, and dismissed Plaintiff's cause of action without prejudice to re-file, in accordance with Ark. R. Civ. P. 41.

73.

On April 4, 2013, the Arkansas State Medical Board voted unanimously to commend Plaintiff for passing the American Board of Surgery exams, but informed him that he must complete the physician assessment program or have a hearing before his license renewal date in November 2013.

74.

On August 1, 2013, the Arkansas State Medical Board voted to proceed with a disciplinary hearing against Plaintiff in October 2013 unless Plaintiff successfully completed the physician assessment program.

75.

On August 2, 2013, Plaintiff applied to attend the KSTAR Physician Assessment Program at Texas A&M University Health Science Center. He paid a total amount of $ 13,000.00 in costs and fees for the assessment. He successfully completed the testing dates on September 5-6, 2013, and the KSTAR Meeting and Determinations on September 30, 2013. The Final Report was prepared on October 9, 2013, and the surgeon who interviewed Plaintiff during his assessment indicated that he would not place any restrictions on Plaintiff's ability to continue his surgical practice.

76.

In December 2013, the Arkansas State Medical Board voted to allow Plaintiff to renew his medical license and accept the KSTAR evaluation in lieu of the PACE assessment program recommended by the Board, but the Board further voted that clarification was required to be received from KSTAR and presented at the Board's February 6, 2014 Board meeting.

77.

On December 23, 2013, the Board, through counsel, wrote the Medical Director of the KSTAR program and provided certain information for his consideration, to include, a "[c]opy of a lawsuit that was filed involving Baptist Medical Center, Little Rock, and Dr. Williams." Notably absent from the materials submitted by the Board to KSTAR was any information related to the surgical cases at issue. According to the correspondence from the Board, it was furnishing the supplemental information to KSTAR "in the hopes that it would give ... a more complete picture of what has happened with Dr. Williams."

78.

On February 25, 2014, Plaintiff re-filed his action against Baptist Health Medical Center in Pulaski County Circuit Court, *Civil Action No. 60CV-14-808*, and added the Arkansas State Medical Board as a named defendant because the Board failed to accept Plaintiff's completion of the KSTAR program, and in light of the other facts and circumstances surrounding Plaintiff's treatment by the State Medical Board since October 2010, even though there had been no hearing held and no finding made by the Board that Plaintiff had violated the Arkansas Medical Practices Act. See *A.C.A. § 17-95-409 (a)(2)(G)* provides that the Arkansas State Medical Board may revoke an existing license, impose penalties as listed in § 17-95-410, or refuse to issue a license in the event the holder or

applicant, as the case may be, has committed any of the acts or offenses defined in this section . . ."

79.

Based upon meetings with the Arkansas State Medical Board, and notwithstanding that there had never been a hearing[16] held where Plaintiff was permitted to cross-examine the witnesses against him,[17] there had already been several adverse actions taken against Plaintiff by the Board which affected his ability to engage in the practice of medicine: (1) Plaintiff performed surgical procedures with a proctor from December 2010 through December 2011; (2) Plaintiff ceased to perform any surgical procedures after his June 8, 2012, appearance before the Board pending completion of the physician assessment program; and (3) Plaintiff attended and completed the physician assessment program at Texas A&M University in September 2013.

80.

The Arkansas State Medical Board was served with the lawsuit (*Civil Action No. 60CV-14-808*) that was filed by Plaintiff on February 25, 2014, by personal service on Beck, Chairman of the Arkansas State Medical Board on March 7, 2014.  The Complaint, received by Chairman Beck on March 7, 2014 clearly indicated that McKissic was no longer representing Plaintiff, and that Plaintiff

---

[16]    *A.C.A. § 17-95-410(e)(1)* provides in relevant part that, "[a]t the conclusion of the hearing, the board shall first decide whether the accused is guilty of the charges against him or her and then decide on appropriate disciplinary action."  Section *(e)(3)* of the same statute provides that *if the accused is found guilty* of the charges against him or her, then the board is authorized to take one or more of specifically designated adverse actions.

[17]    *A.C.A. § 17-95-410(a)* provides in relevant part that, "[a]ny person may file a complaint with the Arkansas State Medical Board against any person having a license to practice medicine in this state charging the licensee with ... [t]he commission of any of the offenses enumerated and described as unprofessional conduct in § 17-95-409."  To date, there has/had been no complaint filed against Plaintiff with respect to the four cases at issue that complies with *A.C.A. § 17-95-410(a).*

was seeking to have the trial court in *Civil Action No. 60CV-14-808* enjoin any further proceedings against Plaintiff by the Board.

81.

In the Complaint (*Civil Action No. 60CV-14-808*), in addition to expressly pleading for injunctive relief and asking the trial court to enjoin the upcoming scheduled hearing, Plaintiff also specifically referenced that, "[o]n January 22, 2014, the Arkansas State Medical Board wrote counsel for Plaintiff indicating that, the hearing involving Dr. Williams has been rescheduled to the April Board meeting, and that, "as soon as I have the exact date and time, I will let you know."

82.

After reading this statement in the Complaint, apparently the Board, through its attorney contacted Plaintiff's former counsel, Gene McKissic and learned that Plaintiff had not been served with notice[18] of the specific date and time for a hearing. McKissic informed the Board's counsel that Plaintiff had in fact retained new counsel, and that the Board needed to contact the new counsel with any questions about the lawsuit (*Civil Action No. 60CV-14-808*) and/or any matters pertaining to Plaintiff's medical license and the Arkansas State Medical Board.

83.

After being told in March 2014, that Mr. McKissic no longer represented Plaintiff, and without otherwise sending written notice to Plaintiff that it would go forward with a hearing on April 3, 2014, notwithstanding Plaintiff's request for injunctive relief in *Civil Action No. 60CV-14-808*,

---

[18]    See *A.C.A. § 17-95-410(c)(2)*, which requires that the Board send "by registered mail to the person's last known address of record a copy of the order and notice of hearing along with a ***written notice of the time and place of the hearing*** ..."

-35-

the Board, went forward with a hearing in Plaintiff's absence and revoked his medical license in April 2014. At the time that the Arkansas State Medical Board revoked Plaintiff's medical license in April 2014, as a result of the hearing held on April 4, 2014, the defendants knew that Plaintiff had no knowledge that the hearing was to be held on that date and they wanted to go forward anyway so that Plaintiff could not be present to defend himself.[19]

84.

On April 30, 2014, the Board submitted a report to the National Practitioner Data Bank stating that the Board had revoked Plaintiff's medical license because Plaintiff had "violated the Medical Practices Act, in that he exhibited gross negligence and ignorant malpractice in the manner in which he performed diagnostic workup and surgical procedures."

85.

Plaintiff filed an appeal and a *Petition for Judicial Review* of the Board's Order revoking his medical license in Pulaski Circuit Court on May 2, 2014, *Civil Action No. 60CV-14-1739*. On that same date, Plaintiff filed a *Motion to Stay Order Revoking Medical License*, and attached thereto an Affidavit of Gene McKissic, which clearly evidenced that Plaintiff had not been notified of the date and time for the hearing that was held in his absence.

86.

On April 15, 2015, just two days prior to a scheduled hearing on *Plaintiff's Motion for Declaratory Judgment*, that had been filed in both *Civil Action No. 60CV-14-1739* and *Civil Action*

---

[19]    See *A.C.A. § 17-95-410 (e)(1)*, ("At the conclusion of the hearing, the board shall first decide whether the accused is guilty of the charges against him or her and then decide on appropriate disciplinary action.")

No. 60CV-14-808 on December 1, 2014, and *Plaintiff's Motion to Compel* discovery from the Arkansas State Medical Board that was filed in *Civil Action No. 60CV-14-808* on March 3, 2015, the trial court in entered an Order for the parties to engage in a settlement conference to address the issues raised in both cases.

87.

The parties held settlement conferences on May 12, 2015, and on June 4, 2015, and a tentative agreement was reached with proposed consent orders to be drafted and entered in both *Civil Action No. 60CV-14-808,* and *Civil Action No. 60CV-14-1739*. However, after the parties exchanged proposed "consent orders," on August 19, 2015, Plaintiff filed a motion to enforce settlement agreement because the Board rejected Plaintiff's proposed order, and the Board's proposed order contained terms different from those agreed to by Plaintiff during the settlement conference.

88.

On October 5, 2015, the trial court entered an order directing the parties to execute the proposed order prepared by the Board finding that "it properly reflects the settlement agreement between the parties to this action."[20] Under the Board's consent order, Williams dismissed *Civil Action No. 60CV-14-1739* with prejudice, and dismissed the Board defendants from *Civil Action No. 60CV-14-808* with prejudice. The Board reinstated Plaintiff's medical license and agreed to postpone disposition and/or disciplinary action to be taken on the four surgical cases at issue until the final disposition of *Civil Action No. 60CV-14-808*. The Board's consent order was executed as ordered and filed on November 3, 2015.

---

[20] To the extent that it relates to other errors to be enumerated in Plaintiff's appeal of *Civil Action No. 60CV-14-808*, this Order may too be subject to appeal, but the decision regarding whether there will be an appeal of this Order has not yet been made, and is not otherwise material to the allegations being raised in this federal action.

89.

On November 3, 2015, the Board submitted a report to the National Practitioner Data Bank stating that effective October 30, 2015, there was a "revision to state licensure action," and that Plaintiff's license was "restored or reinstated, conditional," and that the basis for initial action was, "substandard or inadequate care."

90.

Because during the settlement discussions, it was clear that Plaintiff had no notice of the April 2014 hearing, and that Plaintiff's offer of settlement was based upon the voiding and rescinding of the National Practitioner Data Bank report, and his being placed in the same position as he was in before the April hearing took place, Plaintiff disputed the accuracy of the report pursuant to the procedures authorized by the Department of Health and Human services. After requesting and receiving correspondence from both Plaintiff and the Board, the Secretary of the U.S. Department of Health and Human Services agreed with Plaintiff and on November 25, 2016, ordered that both the April 30, 2014 National Practitioner Data Bank reports submitted and the November 3, 2015 report by the Board against Plaintiff be voided because they were "not required to be filed; the action does not meet the legal reporting criteria."

91.

After it had first refused to void the data bank report itself, and after the Department of Health and Human Services unilaterally voided the report submitted by the Arkansas State Medical Board against Plaintiff on November 25, 016, on December 6, 2016, the Arkansas State Medical Board again submitted a report to the National Practitioner Data Bank stating that there was a "limitation or restriction" on Plaintiff's medical license effective October 30, 2015, stating as its basis, the

Consent Order that Plaintiff was ordered to execute by the trial court in *Civil Action No. 60CV-14-808*.

92.

The publishing of these reports by the Arkansas State Medical Board was done at the direction of Defendant Beck, acting as Chairman of the Arkansas State Medical Board, and was intentional, and done with malice, with the specific intent to interfere with Plaintiff's ability to earn a living by engaging in the practice of medicine in the State of Arkansas.

93.

Plaintiff engaged in protected activity when he filed his *Complaint for Damages and Injunctive Relief* in Pulaski Circuit Court (*Civil Action No. 60CV-14-808*) on February 24, 2014, wherein he alleged among other things, racial discrimination, a matter of public concern.  In *Civil Action No. 60CV-14-808*, he alleged that the named defendants, to include members of the Arkansas State Medical Board, an agency of the state of Arkansas, who had used their positions to engage in racial discrimination against Plaintiff on the basis of his race, Black.

94.

Because they knew that Plaintiff would not appear at the hearing held on April 3, 2014, due to a lack of proper notice of the same, as part of the conspiracy to retaliate against Plaintiff for complaining about racial discrimination, the agents, employees, and/or representatives of the Arkansas State Medical Board went forward with the hearing and revoked Plaintiff's medical license in retaliation for him filing *Civil Action No. 60CV-14-808*.

<u>COUNT I</u>

103.

Plaintiff adopts paragraphs 1 through 102, and incorporates them in Count I, as if fully stated herein.

104.

*42 U.S.C. § 1981* provides that, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

105.

The acts hereinbefore alleged against the defendants constitute a violation of *42 U.S.C. § 1981* for discrimination and retaliation, and the defendants are liable therefore jointly, and severally, in their individual and personal capacities.

<u>COUNT II</u>

106.

Plaintiff adopts paragraphs 1 through 105, and incorporates them in Count II, as if fully stated herein.

107.

The acts hereinbefore alleged constitute a violation of *42 U.S.C. §§ 1981, and 1983* for discrimination and retaliation, and defendants are liable therefore jointly, and severally, in their individual and personal capacities because they engaged in a conspiracy with defendants Beck and

Hearnsberger, who acted under the color and authority of state law, to effectuate the end result of the conspiracy to revoke Plaintiff's Arkansas medical license in retaliation against Plaintiff for filing *Civil Action No. 60CV-14-808*, wherein he complained about racial discrimination, a matter of public concern.

108.

The acts hereinbefore alleged constitute a violation of *42 U.S.C. § 1983* for retaliation under the *First Amendment* of the United States Constitution, and defendants are liable therefore jointly, and severally, in their individual and personal capacities because they engaged in a conspiracy with defendants Beck and Hearnsberger, who acted under the color and authority of state law, to effectuate the end result of the conspiracy to revoke Plaintiff's Arkansas medical license in retaliation against Plaintiff for seeking redress and requesting assistance from the Arkansas State Medical Board to investigate perceived racial discrimination.  Plaintiff had filed a written request with the Arkansas State Medical Board seeking help in June 2010, after the adverse action had been taken against him by Baptist Health Medical Center in April 2010.  Baptist Health Medical Center filed a report with the National Practitioner Data Bank two weeks later on June 24, 2010 even though it maintained throughout the litigation in *Civil Action No. 60CV-14-808*, that Plaintiff was never summarily suspended, and even though the adverse action taken by Baptist Health Medical Center did not become final until April 2011.

109.

These acts hereinbefore alleged constitute a violation of *42 U.S.C. § 1983* for retaliation under the *First Amendment* of the United States Constitution, and defendants are liable therefore jointly, and severally, in their individual and personal capacities because they engaged in a

conspiracy with defendants Beck and Hearnsberger, who acted under the color and authority of state law, to effectuate the end result of the conspiracy to revoke Plaintiff's Arkansas medical license in retaliation against Plaintiff for filing *Civil Action No. 60CV-14-808*, wherein he complained about racial discrimination, a matter of public concern.

<u>COUNT III</u>

110.

Plaintiff adopts paragraphs 1 through 109, and incorporates them in Count III, as if fully stated herein.

111.

The acts hereinbefore alleged constitute a denial of equal protection of the laws, as well as both procedural and substantive due process in violation of *42U.S.C. § 1983* and the *Fourteenth Amendment* of the United States Constitution, and defendants are liable therefore jointly, and severally, in their individual and personal capacities because they engaged in a conspiracy with defendants Beck and Hearnsberger, who acted under the color and authority of state law, to effectuate the end result of the conspiracy to deprive Plaintiff of a property right, by revoking his Arkansas medical license because of his race without giving him adequate notice and a meaningful opportunity to first challenge the charges against him.

112.

Further, the acts hereinbefore alleged constitute a denial of equal protection of the laws, as well as both procedural and substantive due process in violation of *42U.S.C. § 1983* and the *Fourteenth Amendment* of the United States Constitution, and defendants are liable therefore jointly, and severally, in their individual and personal capacities because they engaged in a conspiracy with

defendants Beck and Hearnsberger, who acted under the color and authority of state law, to effectuate the end result of the conspiracy to deprive Plaintiff of the liberty interest in his professional reputation because of his race by publishing stigmatizing statements about him related to the revocation of his medical license without ever giving him the opportunity to refute the same.

<u>COUNT IV</u>

113.

Plaintiff adopts paragraphs 1 through 112, and incorporates them in Count IV, as if fully stated herein.

114.

*42 U.S.C. § 1982* provides that, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

115.

The acts hereinbefore alleged against the defendants constitute a violation of *42 U.S.C. § 1982* for discrimination with the intent to deprive Plaintiff of his ability to fully hold, use and enjoy his real property located at 9712 W. Markham Street, Little Rock, Arkansas based upon his race, Black, and the defendants are liable therefore jointly, and severally, in their individual and personal capacities.

<u>COUNT V</u>

116.

Plaintiff adopts paragraphs 1 through 115, and incorporates them in Count V, as if fully stated herein.

117.

The defendants are liable individually, jointly and severally pursuant to the Arkansas state law

tort of abuse of process for revoking Plaintiff's Arkansas medical license in order to coerce him to

drop and/or to deter him from continuing to pursue the civil claims alleged in *Civil Action No. 60CV-*

*14-808*.

## COUNT VI

118.

Plaintiff adopts paragraphs 1 through 117, and incorporates them in Count VI, as if fully stated

herein.

119.

The defendants are liable individually, jointly and severally pursuant for tortious interference

with contracts for their purposeful, and malicious conduct in knowingly revoking Plaintiff's

Arkansas medical license in his absence, without providing adequate and proper notice, and

subsequently reporting stigmatizing statements relating thereto in order to interfere with Plaintiff's

contractual and business relationships with his patients, insurance providers, and other hospitals.

120.

The defendants caused the revocation of Plaintiff's Arkansas medical license in April 2014

with the intent to interfere with Plaintiff's ability to fulfill his contractual obligations with his

patients, insurers, and business expectancy to continue to provide complete, unrestricted, medical

and surgical services to his patients at his Markham Street medical office.

## COUNT VII

### 121.

Plaintiff adopts paragraphs 1 through 120, and incorporates them in Count VII, as if fully stated herein.

### 122.

The defendants are liable individually, jointly and severally for defamation with respect to any and all such false, defamatory statements that relate to Plaintiff's competency as a physician and that relate to the revocation of Plaintiff's Arkansas medical license in April 2014, and that have been and/or may be published to any hospital, insurance provider, insurer, patient, or other person(s) from the date beginning one year prior to the filing of this action.

**WHEREFORE**, Plaintiff prays for temporary and permanent injunctive relief from the Court and judgment against the defendants as follows:

( A )   That the Plaintiff have permanent injunctive relief against all of the defendants preventing and precluding the continuation of any conduct or actions taken in furtherance of the conspiracy being practiced against Plaintiff, including, but not limited to reinstatement of Plaintiff's medical staff privileges;

(B)   That the Plaintiff have an injunction against the Arkansas State Medical Board requiring the Board to correct the reports that it has sent to the National Practitioner Data Bank;

(C)   That Plaintiff recover compensatory damages from the defendants individually, jointly and severally, in an amount in excess of $75,000.00 and said amount to be determined at trial;

( D )  That Plaintiff recover exemplary and/or punitive damages from the defendants individually, jointly, and severally, in an amount to be determined at trial;

( E )  That Plaintiff be granted a trial by jury with respect to all issues triable to a jury;

( F )  That Plaintiff recover all costs and attorneys fees associated with the prosecution of this action;

(G)   That the defendants be enjoined from further retaliating against the Plaintiff;

(H)   That all of the defendants to include all Baptist Hospital Committees and the Arkansas Medical Board be ordered to make and keep accurate, reliable and certifiable minutes at each stage of any investigation; and

( I )   That Plaintiff have such other and further relief as the Court deems equitable, just and proper.

Respectfully submitted,

By: _____
André K. Valley ABN 96225

André K. Valley, Esq., P.A.
423 Rightor Street, Ste. 2
Helena, AR 72342

andrekvalley@gmail.com
870-338-6487 Ext.2 Telephone
870-338-8030 Facsimile